## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RYAN HANS | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 25-3595 |
| | : | |
| UNUM LIFE INSURANCE COMPANY | : | |
| OF AMERICA | : | |

## MEMORANDUM

KEARNEY, J.                                                          January 15, 2026

A river pilot facing health challenges in 2023 and 2024 consistent with long COVID today asks we reverse an insurer's denial of long term disability payments after finding he is not disabled under the terms of his employer's long term disability policy. His employer delegated to the insurer discretionary authority to make benefit determinations including determining eligibility for benefits, the amount of benefits, resolving fact disputes, and interpreting and enforcing the employer's long term disability plan. Federal courts must defer to the insurer's benefit decision where, like here, the employer delegates discretionary authority to make such decisions to the insurer. Our Court of Appeals requires we test whether a reasonable mind might accept the relevant evidence adequately supports the insurer's benefit decision.

The insurer before us studied multiple medical records, vocational assessments, and the river pilot's evidence concerning his day-to-day activity leading to its detailed findings. The river pilot now disagrees with the insurer's findings. But we cannot substitute our judgment to disturb an insurer's comprehensive and reasoned benefits decision supported by substantial evidence. We cannot find an arbitrary and capricious denial of benefits to the river pilot on review of the administrative record and the parties' fully-briefed arguments. We grant judgment on the administrative record in favor of the insurer.

I.    **Undisputed Facts**

Ryan Hans began working as a river pilot for The Pilots' Association for the Bay & River Delaware on January 3, 2020.[1] River pilots are "experienced and highly-trained mariners responsible for navigating commercial vessels on the Delaware River [and] Bay and its tributaries" and are "responsible for ensuring maritime safety by acting in the public interest and using their professional judgment while moving thousands of commercial vessels each year."[2]

*Mr. Hans is covered by a long term disability policy issued to his employer.*

The Pilots' Association maintained a long term disability plan (the "Plan") for its employees like Mr. Hans funded by a policy issued by Unum Life Insurance Company ("Group Policy").[3] The Pilots' Association administers the Plan.[4] It delegated claims administration to Unum, giving Unum discretionary authority to make benefit determinations under the Plan including eligibility for benefits, the amount of benefits, resolving factual disputes, and interpreting and enforcing provisions of the Plan.[5]

The Pilots' Association, on behalf of its employees, agreed an employee participant is "disabled" when Unum determines (1) the participant "[is] limited from performing the material and substantial duties of [his] *regular occupation* due to [his] sickness or injury;" and (2) the participant "[has] a 20% or more loss in [his] indexed monthly earnings due to the same sickness or injury."[6] A participant "must be under the regular care of a physician in order to be considered disabled."[7]

The Pilots' Association also agreed to the Group Policy defining "regular occupation" as one "you are routinely performing when your disability beings. Unum will look at your occupation as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location."[8] The Pilots' Association also agreed to the Group

2

Policy defining "material and substantial duties" as those "normally required for the performance of your regular occupation; and cannot be reasonably omitted or modified, except that if you are required to work on average in excess of 40 hours per week, Unum will consider you able to perform that requirement if you are working or have the capacity to work 40 hours per week."[9]

The Pilots' Association through the Group Policy requires a claimant "must be continuously disabled through [claimant's] elimination period. Unum will treat [claimant's] disability as continuous if [claimant's] disability stops for 30 days or less during the elimination period. The days that [claimant] [is] not disabled will not count toward [claimant's] elimination period."[10] The elimination period is 360 days.[11] The Pilots' Association through the Group Policy provides Unum may require the claimant "to be examined by a physician, other medical practitioner and/or vocational expert of [Unum's] choice" paid for by Unum and Unum "can require an examination as often as it is reasonable to do so."[12]

### *Mr. Hans experienced a variety of medical symptoms beginning in mid-April 2023 and stopped working as a river pilot one month later on May 16, 2023.*

Mr. Hans went to Pennsylvania Hospital's Emergency Department on April 15, 2023 with sudden chest pain, increased heart rate, symptoms of anxiety, lightheadedness, and shortness of breath.[13] Testing showed an elevated heart rate and blood pressure and possible cardiac abnormalities, but test results were otherwise normal and unremarkable and the hospital discharged Mr. Hans.[14]

Mr. Hans stopped working as a river pilot a little over a month later on May 16, 2023.[15]

### *Mr. Hans sought medical treatment beginning in May 2023 and began treating for long COVID.*

Mr. Hans continued to experience an elevated heart rate and consulted with two cardiologists, Jon George, M.D. and Scott Gabler, M.D., as well as his primary care physician Leonard Ridilla, M.D. in May and June 2023.[16] Mr. Hans reported to Dr. Gabler episodes of rapid heart rate often accompanied by left axillary pain and neurological symptoms which interfered with his work as a river pilot.[17] Cardiology testing revealed essentially normal results.[18]

Mr. Hans returned to Pennsylvania Hospital's Emergency Department on two separate occasions in late July 2023 with complaints of intermittent palpitations, rapid heart rate, lightheadedness, tingling sensation in his extremities, dizziness, shortness of breath, and headaches.[19] Medical staff at the Emergency Department on July 28, 2023 reported a clinical impression of tachycardia, palpitations, chest pain, paresthesia, and dyspnea.[20] Testing including EKG, chest x-ray, and cardiac lab testing revealed "reassuring" results and an MRI of the brain showing no acute findings.[21] Mr. Hans told medical staff during a July 30, 2023 visit to the Emergency Department of believing his symptoms to be the result of dysautonomia secondary to a COVID-19 infection in March 2023.[22]

Mr. Hans saw his primary care physician Dr. Ridilla in June 2023 for persistent tachycardia and left axillary pain and numbness in his left hand and foot.[23] Dr. Ridilla's examination showed mild muscle spasm but otherwise normal, noted normal cardiac testing, and ordered additional lab work.[24]

Mr. Hans saw Dr. Ridilla again in July 2023 through a telehealth visit.[25] Mr. Hans attributed his symptoms to long COVID.[26] Dr. Ridilla attributed Mr. Hans's symptoms to anxiety and to prescribed anxiety medication.[27]

Advanced Practice Registered Nurse India Scott, a long COVID specialist, evaluated Mr. Hans for long COVID on August 2, 2023.[28] Nurse Scott diagnosed Mr. Hans with long COVID and prescribed him multiple medications.[29]

Mr. Hans had follow-up appointments with Nurse Scott and Dr. Ridilla in late August and early October 2023, and continued to report fluctuating left-side pain, tingling, muscle spasms, heightened sensitivity to stimuli, significant neurologic and sensory issues including fatigue, neck pain, left arm tingling, and sensitivity to noise and light.[30] Mr. Hans reported improvement and Dr. Ridilla documented Mr. Hans regained about 95% of his functioning.[31]

Mr. Hans continued to treat with Nurse Scott in October and November 2023, reporting improvement in his symptoms but still suffering from palpitations, stiffness, and left-side tingling.[32] Nurse Scott identified a reactivation of the Epstein–Barr virus and recommended continued therapies to treat Mr. Hans's symptoms.[33]

Neurologist Steven Bromley, M.D. evaluated Mr. Hans on November 22, 2023 for ongoing neuropathy and sensory disturbances.[34] Dr. Bromley assessed Mr. Hans with chronic post-COVID-19 syndrome, idiopathic peripheral neuropathy, low back pain, paresthesia, and anxiety disorder.[35] Dr. Bromly recommended further testing and treatment for symptom management.[36]

Cardiologist Dr. Gabler again evaluated Mr. Hans at the end of November 2023.[37] Mr. Hans reported gradual improvement. Dr. Gabler's examination of Mr. Hans, his EKG, and his echocardiogram were all normal.[38] Dr. Gabler diagnosed Mr. Hans with long COVID and atypical chest pain with no evidence of cardiac disease and recommended continued therapy.[39]

Mr. Hans had three telehealth follow-up appointments with Nurse Scott from December 2023 through February 2024.[40] Mr. Hans reported gradual improvement but continued fatigue,

nerve pain, and post-exertional symptoms. Nurse Scott noted overall improvement with tingling and nerve pain persisting and recommended continued treatment for post-COVID-19 syndrome.[41]

Primary care physician Dr. Ridilla and neurologist Dr. Bromley both examined Mr. Hans in follow-up appointments in March and April 2024.[42] Mr. Hans reported to Dr. Ridilla a 90 to 100 percent cognitive recovery but continued fatigue and left-side tingling.[43] Dr. Ridilla's examination showed normal results with the exception of elevated blood pressure.[44]

Mr. Hans reported improvement to Dr. Bromley but continued symptoms of numbness, tingling, and balance issues. Dr. Bromley's examination showed normal results. Dr. Bromley prescribed medicine for anxiety, advised continued medication and supplements, and ordered EMG/nerve testing.[45] Both Dr. Ridilla and Dr. Bromley diagnosed Mr. Hans with long COVID (or post-COVID-19 syndrome), continued treating him with medications, and ordered additional testing.[46]

Mr. Hans continued follow-up telehealth visits with Nurse Scott for long COVID and coagulation treatment. He reported improved endurance to Nurse Scott in a March 21, 2024 visit, but reported an incident where he "crashed" after donating blood requiring a week of recovery to baseline.[47]

***Mr. Hans applied for long term disability benefits on April 30, 2024.***

Mr. Hans applied for long term disability benefits on April 30, 2024, 350 days after he became unable to work as a river pilot as of May 17, 2023, consistent with the Group Policy requirement of continuous disability through the 360-day elimination period.[48] Mr. Hans identified long COVID as his medical condition and identified his symptoms as "tachycardia, vertigo, pre-syncope, neuralgia, chronic fatigue, etc."[49] He reported he is "[u]nable to safely pilot vessels due to physical and mental limitations caused by numerous ongoing symptoms."[50]

6

The General Manager of the Pilots' Association, Jason Rowinski, completed the employer statement in support of Mr. Hans's application for long term disability benefits.[51] General Manager Rowinski described Mr. Hans's job duties as a river pilot to include "board vessel by climbing gangway and [J]acob's ladder. Then safely guide the vessel's passage on the Delaware River and tributaries."[52]

Nurse Scott completed the attending physician statement in support of Mr. Hans's application for long term disability benefits.[53] Nurse Scott noted Mr. Hans's primary diagnosis as post COVID-19 (condition unspecified), coagulation defect (unspecified), mast cell activation syndrome (MCAS), and "debilitating" postural orthostatic tachycardia syndrome (POTS).[54] Nurse Scott reported Mr. Hans's physical restrictions and limitations as "no prolonged standing for more than 10 minutes, no heaving lifting over 20 lbs., no exertion of walking [sic] for more than 10 minutes at a time. No repetitive bending or stooping."[55] Nurse Scott also reported behavioral health restrictions and limitations as "unable to perform prolonged tasks that require intense mental concentration. Unable to work in stressful environment for extended periods of time."[56] Nurse Scott identified the duration of these limitations from August 2, 2023 to November 18, 2024.[57]

### *Unum began reviewing Mr. Hans's application for long term disability benefits in early May 2024.*

Unum Benefits Specialist Suzanne Guiggey began reviewing Mr. Hans's long term disability claim on May 7, 2024.[58] Benefits Specialist Guiggey first interviewed Mr. Hans who reported he stopped working as a river pilot on May 16, 2023 because of worsening long COVID symptoms preventing his return to work as a river pilot.[59]

Benefits Specialist Guiggey requested Unum's vocational consultant Jonathan Fandel to prepare an occupational analysis of Mr. Hans's claim and requested Unum's medical reviewer Dr. Sri Lalitha Nyshadam prepare a clinical analysis of Mr. Hans's claim in mid-June 2024.[60]

Unum's Vocational Consultant Fandel determined Mr. Hans's occupation in the national economy is a "Pilot, Ship."[61] Vocational Consultant Fandel identified the physical demands of a "Pilot, Ship" as occasionally lifting, carrying, pushing, and pulling up to twenty pounds, frequently lifting, carrying, pushing, and pulling up to ten pounds, and constantly lifting negligible amounts; frequent sitting, occasionally standing, walking, climbing, and balance.[62] Vocational Consultant Fandel identified cognitive demands of the occupation to include directing, controlling, or planning activities of others, making judgments and decisions, dealing with people, and performing effectively under stress.[63]

Benefits Specialist Guiggey asked Dr. Nyshadam to address whether, based on the available information, Mr. Hans is "precluded from performing the full-time demands outlined" in Vocational Consultant Fandel's occupational analysis from May 17, 2023 through May 11, 2024 "and beyond."[64] Dr. Nyshadam considered medical records from Mr. Hans's treating providers Nurse Scott, Dr. Gabler, Dr. Bromley, and Dr. George as well as diagnostic testing.[65] Dr. Nyshadam concluded "[i]t would be reasonable to preclude [Mr. Hans] from [Date of Disability] but would need additional medical input to determine [Functional Capacity] from long COVID standpoint with no exam finding with long COVID specialist and titration of meds through the [Elimination Period] period [sic]."[66]

Benefits Specialist Guiggey obtained a review of Mr. Hans's medical records by Unum Medical Consultant Dr. Katrina Turner, an internal medicine specialist, and Unum Designated Medical Officer Dr. Keren McCarthy, an internist in July 2024.[67]

Dr. Turner, considering the medical and behavioral health conditions and giving "significant weight" to the attending physician, concluded the evidence did not support restrictions and limitations precluding Mr. Hans from full time work in his occupation.[68] Nurse Scott responded to Dr. Turner's request for information, disagreeing Mr. Hans could return to work as a river pilot full time.[69] Nurse Scott explained Mr. Hans showed progress with treatment but he continued to suffer significant fatigue, post-exertional malaise, and mast cell activation syndrome from long COVID and lab testing showed reactivated Epstein–Barr virus contributing to chronic fatigue preventing him from working as a river pilot.[70] Nurse Scott noted Mr. Hans's ongoing treatment plan and her goal of his return to work as a river pilot in six months.[71]

Unum's Designated Medical Officer Dr. McCarthy concurred with Dr. Turner's assessment. Dr. McCarthy concluded the medical evidence did not support restrictions and limitations precluding Mr. Hans from full-time work as a river pilot as of April 1, 2024.[72] Dr. McCarthy considered medical records beginning November 30, 2023 through June 24, 2024 from Mr. Hans's treating cardiologist Dr. Gabler, Nurse Scott, and treating neurologist Dr. Bromly, and concluded Mr. Hans is not restricted from full-time employment as a river pilot.[73]

Dr. Ridilla, Mr. Hans's primary care physician, disagreed with Dr. Turner's assessment.[74] Dr. Ridilla, on July 22, 2024, reported Mr. Hans as improved but he "still has significant disability" on an "almost weekly basis" and "at least several times per month" with "severe fatigue and lack of mental clarity that he has difficulty getting out of bed."[75] Dr. Ridilla reported Mr. Hans's episodes would interfere with his ability to interact with and lead others and his judgment would be impaired and worsen if under stress. Dr. Ridilla opined Mr. Hans is not able to return to work.[76]

Both Unum Medical Consultant Dr. Turner and Designated Medical Officer Dr. McCarthy reviewed Dr. Ridilla's July 22, 2024 opinion. Both Dr. Turner and Dr. McCarthy agreed their

opinions remained unchanged, noting a lack of recent treatment notes from Dr. Ridilla and no new medical information from Nurse Scott.[77]

Unum obtained updated medical records from Mr. Hans's August 5, 2024 follow-up visit with Dr. Ridilla.[78] Dr. Ridilla's August 5, 2024 progress note reported Mr. Hans's long COVID syndrome with symptoms causing "major episodes" since mid-August 2023 of chest pain with rapid heart rate, excessive fatigue, electrical shock sensation running from his ear to his foot on the left side of his body, an elevated Epstein–Barr virus titer, and, although Mr. Hans reported feeling "somewhat better," he still experiences symptoms about two-thirds of the month.[79] Mr. Hans reported to Dr. Ridilla a feeling "like he has been poisoned and that he is walking in quicksand," variable good days and bad days, but the unpredictability of a bad day with symptoms prevents him from working.[80] Dr. Ridilla also provided updated information Mr. Hans continued to struggle with long COVID exacerbated by an Epstein–Barr virus infection, and opined Mr. Hans required an additional six months of disability leave before returning to work full time.[81]

### *Unum denied Mr. Hans's long term disability claim on September 4, 2024.*

Both Dr. Turner and Dr. McCarthy reviewed Dr. Ridilla's updated medical records and opinion and each concluded their opinions remained unchanged.[82] Dr. Turner concluded the weight of the medical evidence did not support restrictions and limitations precluding Mr. Hans from working full time as a river pilot.[83] Dr. McCarthy concurred with Dr. Turner's finding and concluded the updated medical records did not support restrictions, exam findings are "extremely minimal," there is no new exam or diagnostic evidence as a basis to change her opinion, treatment frequency is less than monthly and consisted of minor medication prescriptions consistent with "a low treatment frequency and intensity," Mr. Hans conceded he did not take a prescription medication which could indicate noncompliance with treatment, Mr. Hans noted his various

workups were normal, and Mr. Hans conceded significant improvement in energy levels and cognitive abilities.[84]

Four days later, on September 3, 2024, Benefits Specialist Guiggey denied Mr. Hans's claim for long term disability benefits.[85] Benefits Specialist Guiggey explained the Pilots' Association through the Group Policy contained a 360-elimination period during which Mr. Hans must be continuously disabled before being eligible for long term disability benefits. She explained Unum determined May 17, 2023 as the first day of his inability to work in his occupation as a river pilot making the 360-day elimination period end as of May 10, 2024. She explained Unum reviewed medical records, examination findings, diagnostic testing, the intensity of the management of his symptoms, and coexisting medical conditions, and determined the medical records showed he is not precluded from performing his occupational duties as of April 1, 2024 (within the elimination period).[86]

### Mr. Hans appealed Unum's denial of his claim and provided Unum with additional information supporting his appeal.

Mr. Hans, through counsel, appealed Unum's denial of his claim on February 27, 2025.[87] Mr. Hans provided Unum with documents supporting his appeal including a functional capacity evaluation, vocational assessment, declaration of Mr. Hans, additional information from Dr. Ridilla, medical records from Dr. Ridilla, Nurse Scott, Dr. Bromley and infectious disease specialist, Mark Ingberman, M.D., Penn Medicine, articles on the effects of long COVID, and information regarding Unum's alleged conflict of interest.[88]

The additional information in Mr. Hans's appeal included a two-day functional capacity evaluation in early January 2025 by occupational therapist Lori Eckert.[89] Therapist Eckert noted Mr. Hans presented with increased pain, decreased global strength in all joints and grip strength,

a higher resting heart rate, and increase in symptoms of dysautonomia on the second day of testing.[90] Therapist Eckert noted Mr. Hans's decreased endurance and strength is likely caused by dysautonomia "which may be the result" of long COVID or a side effect of an active Epstein–Barr virus.[91] Therapist Eckert opined "[r]egardless of the cause, it would be dangerous for [Mr. Hans] to return to previous level of work considering the extreme level of physicality the job entails, in addition to the long hours and less than ideal weather conditions he is required to perform under."[92] Therapist Eckert deferred to Mr. Hans's physician for further recommendation.[93] Dr. Ridilla submitted a February 13, 2025 letter to Unum including his agreement with Therapist Eckert's functional capacity evaluation.[94]

Mr. Hans's counsel also obtained a vocational file review with labor market data by Certified Rehabilitation Counselors Charles Galarraga and Nicole Duchette on February 20, 2025.[95] Rehabilitation Counselors Galarraga and Duchette opined Mr. Hans cannot perform the material and substantial duties of his regular occupation as a ship pilot and "deckhand" in the national economy.[96] Rehabilitation Counselor Galarraga and Duchette opined Mr. Hans's occupation as a composite ship pilot and deckhand exceeds the "light-heavy physical demand" level based on the requirement he climb onto large, moving vessels from a small moving vessel in all weather to pilot a vessel, including in rough seas, climbing a Jacob's ladder over twenty feet in wet and windy conditions, walking on unpredictable, uneven, or wet terrain, and climbing stairs and to keep balance on a moving and rolling vessel for multiple hours.[97] Rehabilitation Counselors Galarraga and Duchette concluded Mr. Hans's occupation should be a composite of "Pilot, Ship" and "Deckhand" requiring heavy physical strength.[98]

12

Mr. Hans submitted a declaration on February 26, 2025 outlining his symptoms, his diagnosis of long COVID, his medical treatment and management, his current health status, and his inability to perform the duties of a river pilot.[99]

Mr. Hans also submitted to Unum office notes from a September 25, 2024 consultation with infectious disease specialist Dr. Ingberman.[100] Dr. Ingberman opined Mr. Hans has long COVID, there is not a diagnostic test to establish long COVID syndrome but Mr. Hans is "typical of long COVID syndrome," Mr. Hans's symptoms have improved but he is "not back to normal regarding his fatigue and ability to focus" and 'brain fog," and "would not recommend [Mr. Hans] return to navigating his ship as a pilot along the river … need[ing] more time until his fatigue syndrome resolves or at least decreases significantly."[101]

### Unum obtains its own vocational file review and medical review on appeal and ultimately upholds its decision on June 5, 2025.

Unum obtained its own vocational file review from Senior Vocational Rehabilitation Consultant Julie Degenhardt on March 17, 2025.[102] Consultant Degenhardt considered Mr. Hans's occupation and Rehabilitation Counselors Galarraga and Duchette's February 20, 2025 vocational file review with labor market data.[103] Consultant Degenhardt disagreed with Rehabilitation Counselors Galarraga and Duchette's conclusion, specifically their opinion Mr. Hans's occupation as a ship pilot requires more than light work based on a composite occupation of ship pilot and deckhand.[104] Consultant Degenhardt concluded the Pilots' Association job description and review of comparable occupations of captains, vessel masters, and pilots navigating water vessels reflect the primary function of a river pilot is to navigate or command navigating a water vessel requiring nothing greater than light demand and the information presented in Mr. Hans's appeal did not alter the regular occupation of a ship pilot.[105]

Unum obtained another medical review on March 25, 2025 from Neal Greenstein, M.D., board-certified in internal medicine.[106] Dr. Greenstein opined the symptoms reported by Mr. Hans to his treating providers requiring restrictions and limitations are not continuously supported by and are inconsistent with the exams, diagnostics, therapeutics and activities for the period from May 17, 2023 to May 20, 2024.[107] Dr. Greenstein opined Mr. Hans's anxiety is managed and stable.[108]

Unum provided Mr. Hans's counsel with a copy of Dr. Greenstein's report and allowed for a response.[109] Mr. Hans's counsel responded with an addendum to Mr. Hans's declaration, other file reviews by Dr. Greenstein of other claimants, an addendum to Rehabilitation Counselors Galarraga and Duchette's vocational file review, and vocational resources for evaluating job requirements.[110] Rehabilitation Counselors Galarraga and Duchette's addendum stressed the requirements of Mr. Hans's occupation is best described as light–heavy physical demand, and it is "inaccurate … to ignore this very important aspect of the role in which a pilot has to climb a Jacob's ladder twenty [plus] feet in wet and/or windy conditions, walk across unpredictable, uneven, or wet terrain, then climb multiple flights of stairs, then keep their balance and stand on a moving/rolling vessel for multiple hours."[111] Rehabilitation Counselors Galarraga and Duchette explained these requirements are not considered light duty and "would also not be considered the actual tasks of 'piloting' the vessel," and Unum should use a composite occupation code.[112]

Mr. Hans's addendum to his declaration explained the technical aspects of his occupation as a river pilot, including the use of radar, maps, global positioning systems, and depth sounder, and the difficulties he faces using these technical tools when fatigued, dizzy, and lacking in concentration.[113]

Unum forwarded Rehabilitation Counselors Galarraga and Duchette's addendum and Mr. Hans's supplemental information to Vocational Consultant Degenhardt and Dr. Greenstein.[114] Consultant Degenhardt disagreed with a composite occupation, insisting Mr. Hans's regular occupation is a ship pilot requiring only light work.[115] Consultant Degenhardt disagreed with Rehabilitation Counselors Galarraga and Duchette's opinion Unum should consider the demands of climbing Jacob's ladders in wet and windy conditions, walking across unpredictable, uneven, and wet terrain, and climbing stairs while keeping balanced on a moving and rolling vessel as part of the task of ship pilot. Consultant Degenhardt concluded the eDOT description of a ship pilot included climbing and balancing as demands of Mr. Hans's regular occupation as a ship pilot.[116] Consultant Degenhardt concluded Mr. Hans's regular occupation is a ship pilot, the material and substantial duties of which are light work.[117]

Dr. Greenstein concluded his opinion remained unchanged and nothing in the additional materials provided by Mr. Hans's counsel would alter his March 25, 2025 opinion.[118]

Unum affirmed its decision to deny Mr. Hans's long term disability claim on June 5, 2025.[119]

### *Mr. Hans sued Unum for the denial of long term disability benefits.*

Mr. Hans timely sued Unum alleging it wrongfully denied him long term disability benefits and denied him a full and fair review of his claim for benefits.[120] Unum responded Mr. Hans did not prove entitlement to benefits under the terms of the Group Policy.[121]

## II.    Analysis

Mr. Hans and Unum each moved for judgment on the administrative record. Mr. Hans claims his employer's designated insurer Unum wrongfully denied him long term disability benefits under the Employee Retirement Income Security Act of 1974 (ERISA).[122] Congress

through section 502(a)(1)(B) of ERISA allows a participant or beneficiary of an ERISA plan "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."[123] Mr. Hans seeks judgment in his favor, awarding him all past due disability benefits and future benefits under the terms of the Group Policy, prejudgment interest, attorney's fees and costs, and all other relief to which he may be entitled. Mr. Hans argues he provided evidence to support his disability from his regular occupation, Unum ignored the evidence, and its denial of his long term disability claim is arbitrary and capricious.

Unum moves for judgment arguing it thoroughly evaluated the evidence, obtained medical peer reviews by four physicians and two vocational rehabilitation experts, and concluded Mr. Hans did not provide sufficient evidence to support disability. Unum argues we must uphold its reasoned decision under the arbitrary and capricious standard.

**A. We apply a deferential standard of review to the fiduciary Unum's benefits decision under an abuse of discretion standard, overturning Unum's decision only if it is without reason, unsupported by substantial evidence, or erroneous as a matter of law and considering whether a structural conflict of interest is a factor in determining whether Unum abused its discretion.**

We begin with how to evaluate complex medical evaluations on a relatively new illness widely described as "long COVID" or post-COVID-19 syndrome.

There is no dispute the Pilots' Association delegated to Unum "discretionary authority to make benefit determinations under the Plan" including "determining eligibility for benefits and the amount of any benefits, resolving factual disputes, and interpreting and enforcing the provisions of the Plan."[124] Delegating discretionary authority to Unum requires we review Unum's benefit decision for abuse of discretion.[125]

Unum is the claims fiduciary for the Plan under the terms of the Group Policy.[126] Our review of an ERISA fiduciary's discretionary adverse benefit decision is confined to the administrative record.[127] The administrative record consists of the materials gathered by the fiduciary who makes the benefit decision on internal review, typically consisting of plan documents, the claim file, information supplied by the claimant in support of his claim, and information collected by the claims fiduciary.[128]

When considering the materials in the administrative record, "there is no requirement that an additional evidentiary showing be made if an administrator's rejection of a disability claim arises from reports differing from the claimant's own doctors" and the Supreme Court instructed Congress through ERISA did not "impose a heightened burden of explanation on administrators when they reject a treating physician's opinion[,]" "nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation."[129]

The arbitrary and capricious and abuse of discretion standards of review are "essentially identical" in the ERISA context.[130] Our Court of Appeals cautions we should not "substitute [our] own judgment for that of the defendants in determining eligibility for plan benefits" and we will not disturb a benefits decision if "reasonable."[131] A benefits decision is arbitrary and capricious only "if it is without reason, unsupported by substantial evidence or erroneous as a matter of law."[132] Our Court of Appeals instructs "substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[133]

A claims fiduciary's benefit decision may also be arbitrary and capricious if "a combination of case-specific structural and procedural factors … demonstrate that a fiduciary abused its discretion in making an adverse benefit determination."[134] A structural conflict of interest exists

when the same entity both funds and evaluates disability claims.[135] A structural conflict alone does not render a fiduciary's adverse benefit decision an abuse of discretion; it is a factor we consider in determining abuse of discretion.[136] A procedural conflict of interest considers the presence or absence of procedural irregularities in the handling of the benefit claim.[137] Our Court of Appeals instructs "under the combination-of-factors analysis, procedural irregularities gain significance the more closely that they align with the financial incentives that create a structural conflict of interest."[138]

Mr. Hans asserts Unum's denial of his long term disability claim is arbitrary and capricious, tainted by its structural conflict as both the payor of benefits and evaluator of disability claims. Unum denies a structural conflict of interest.

### B. Unum's benefit decision is reasonable and supported by substantial evidence.

Mr. Hans seeks judgment arguing he satisfied the Group Policy's definition of disability from May 17, 2023 until his return to work on June 1, 2025, because he could not perform the material and substantial duties of his regular occupation as a river pilot resulting from his medically-documented long COVID. He argues Unum's denial of his long term disability claim is arbitrary and capricious because: (1) Unum's vocational reviews failed to consider all material duties of his occupation; (2) Unum improperly dismissed the opinions of his treating medical providers, assigned greater weight to the opinions of its non-examining, in-house physicians, insisted on objective evidence of long COVID, ignored Mr. Hans's functional capacity evaluation, and placed emphasis on his providers' notations of improvement while ignoring his providers' notations he remained disabled; and (3) Unum's decision is tainted by its structural conflict of interest.

Unum seeks judgment arguing (1) Mr. Hans did not meet his burden of establishing disability as defined by the Group Policy; (2) we must uphold its claim determination under the arbitrary and capricious standard of review; and (3) the administrative record supports Unum's denial of benefits decision including vocational analyses, medical analyses, and functional capacity evaluation on initial review and on appeal.

### 1. Unum's determination of the material and substantial duties of Mr. Hans's regular occupation as defined in the Group Policy is not arbitrary and capricious.

A key issue is Unum's determination of the "material and substantial duties" of Mr. Hans's "regular occupation."

Unum's Vocational Consultants Fandel and Degenhardt found Mr. Hans's occupation in the national economy is a ship pilot defined by eDOT as light work. The physical demands of a ship pilot defined by eDOT include occasional standing, walking, climbing and balancing; occasional lifting, carrying, pushing, and pulling up to twenty pounds; pulling up to ten pounds frequently; and frequent sitting. Vocational Consultants Fandel and Degenhardt identified cognitive demands of Mr. Hans's regular occupation to include directing, controlling, or planning activities of others, making judgments and decisions, dealing with people, and performing effectively under stress. Each concluded the job of "river pilot" in the national economy equated to "ship pilot" as defined by eDOT and is a "light duty" job.

Mr. Hans disagrees with Unum's vocational review. He insists Unum's classification of light duty work ignores the physical aspects of his "real-world job as a river pilot," requiring boarding of moving vessels by Jacob's ladders, climbing stairs, maintaining balance on a rolling deck, and working in adverse weather conditions. Mr. Hans argues Unum ignored the opinion of his Rehabilitation Counselors Galarraga and Duchette who concluded his job is a **composite**

19

occupation of ship pilot and deckhand ("heavy work" classification). Mr. Hans argues Unum's vocational review used in denying his long term disability claim is arbitrary and capricious.

The Pilots' Association agreed to define "regular occupation" in the Group Policy as "it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location."[139] The record shows the eDOT defines the ship pilot occupation in the national economy as including light work with climbing and balancing.[140] The eDOT definition of ship pilot demands light work, including climbing and balancing and cognitive demands of directing, controlling, or planning activities of others, judgment and decision-making, dealing with people, and performing effectively under stress.

Unum's Vocational Consultants Fandel and Degenhardt considered these requirements. Unum's Vocational Consultant Degenhardt explained climbing and balancing would include embarking and disembarking vessels by gangways and ladders, including Jacob's ladders, in the demands of a ship pilot.[141] She considered the job description of a ship pilot provided by the Pilots' Association, Mr. Hans's description of his job, and materials submitted by Rehabilitation Counselors Galarraga and Duchette.[142] Vocational Consultant Degenhardt also considered comparable occupations of captains, vessel masters, and pilots navigating water vessels.[143] The primary function of the comparable occupations does not exceed light demand.[144] She concluded Mr. Hans's regular occupation is a ship pilot, rejecting the composite occupation argument as opined by Rehabilitation Counselors Galarraga and Duchette.

In her second review, Vocational Consultant Degenhardt disagreed with Mr. Hans's Rehabilitation Counselors Galarraga and Duchette's opinion Mr. Hans's regular occupation is a composite of ship pilot and deckhand. Vocational Consultant Degenhardt acknowledged Rehabilitation Counselors Galarraga and Duchette's opinion Mr. Hans's regular occupation is a

composite of ship pilot and deckhand and their argument Unum's vocational assessments are not sufficiently comprehensive because they did not fully consider the cognitive demands of Mr. Hans's occupational tasks and did not consider the weather conditions impacting Mr. Hans's occupational demands.[145]

Vocational Consultant Degenhardt explained her disagreement with the opinion of Rehabilitation Counselors Galarraga and Duchette. She explained the eDOT and DOT descriptions identify the primary function of a ship pilot is to command ships to steer in and out of bodies of water requiring specialized knowledge of weather conditions and these functions are performed with light demands.[146] She explained climbing and balancing are included in the eDOT description. She explained the Pilots' Association's job description includes boarding vessels in a variety of manners, not just gangways and Jacob's ladders, with a primary duty of navigating commercial vessels and ensuring maritime safety and compliance with state and federal regulations. She explained Mr. Hans reported the same requirements.[147] Based on the information, Vocational Consultant Degenhardt concluded Mr. Hans's regular occupation is a ship pilot and not a composite ship pilot and deckhand regular occupation.

We may not substitute our judgment for Unum's judgment as long as it is reasoned and we are constrained to apply the governing standard of review requiring we cannot disturb a "reasonable" decision; we may only do so on a finding a decision is without reason and unsupported by substantial evidence or erroneous as a matter of law making the challenged decision arbitrary and capricious. We cannot on this record find Unum's determination Mr. Hans's regular occupation, as defined in the Group Policy, is a ship pilot and not a composite ship pilot and deckhand is arbitrary and capricious.

We are not persuaded by Mr. Hans's inapposite authority hoping to challenge Unum's finding as to his regular occupation. For example, Mr. Hans cites our Court of Appeals's 2003 decision in *Lasser v. Reliance Standard Life Insurance Company*.[148] In *Lasser*, an orthopedic surgeon received disability benefits based on cardiac issues precluding a full-time surgical schedule. The insurance company terminated the physician's long term disability benefits after a later medical review. The physician sued the insurer. Judge Wolin, on cross-motions for summary judgment, concluded the insurer's determination of non-disability met the arbitrary and capricious standard and found the physician entitled to disability benefits. The insurer appealed.

The parties before Judge Wolin in *Lasser* defined disability as the inability to perform the "material duties of [his] regular occupation."[149] Unlike the Unum policy before us today, the policy in *Lasser* did ***not*** define "regular occupation." In the absence of a policy definition, the insurer relied on a broad, generic definition and denied the physician benefits. Our Court of Appeals concluded the undefined term "regular occupation" is not ambiguous and means "the usual work that the insured is actually performing immediately before the onset of disability," even if the term is ambiguous, the insurer's definition of "regular occupation" is unreasonable, and the insurer did not show an intent to "opt out" of the "plainly understood" term "regular occupation" which the insurer could have defined in the policy (but did not do so) at the time of the policy's renewal.[150] Our Court of Appeals affirmed Judge Wolin and held the physician's regular occupation is the occupation he "actually engaged" in immediately before becoming disabled, on-call and emergency surgical duties were material to his regular occupation, and the physician is disabled from performing those duties.[151]

Mr. Hans argues we should apply the Court of Appeals's reasoning in *Lasser*, specifically its determination "regular occupation" means "the usual work that the insured is actually

performing immediately before the onset date of disability."[152] If Unum's Group Policy did not define "regular occupation," we would be factually like *Lasser*. But the Pilots' Association agreed, through the Group Policy, to define "regular occupation" as "normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location."[153] This agreed definition is the opposite of the *Lasser* analysis. We cannot apply our Court of Appeals' guidance in *Lasser* to construe "regular occupation" when the employer agreed, through the Group Policy, to define the term based on how the occupation is normally performed in the national economy.

Our Court of Appeals in *McCann v. Unum Provident* later distinguished *Lasser* as "turn[ing] on the policy language specific to [the] cas[e]."[154] In *McCann*, our Court of Appeals addressed a physician's occupation as defined by the policy as "the occupation … in which you are regularly engaged at the time you become disabled" and, "[i]f [the] occupation is limited to a recognized specialty within the scope of your degree or license, we will deem your specialty to be your occupation."[155] Our Court of Appeals held Unum improperly determined the physician's occupation as a diagnostic radiologist rather than an interventional radiologist within the policy's "recognized specialty" language.[156] The reasoning in *McCann* directs us to apply policy language.

Mr. Hans's reliance on Judge Smith's findings in *Van Arsdel v. Liberty Life Assurance Company of Boston* is also distinguishable.[157] Mr. Hans argues Unum relied exclusively on its own vocational consultants, ignoring his Rehabilitation Counselors Galarraga and Duchette's findings, to classify him as a "light duty" ship pilot instead of considering the physical aspects of his "real-world job as a river pilot" requiring him to board moving vessels by Jacob's ladders, climbing stairs, maintaining balance on rolling decks, and working extended shifts in adverse conditions. He argues Unum's classification of his regular occupation as a ship pilot (light duty) rather than a

composite ship pilot and deckhand (light to heavy work) is arbitrary and capricious like the insurer's arbitrary and capricious choice among different interpretations found by Judge Smith almost nine years ago in *Van Arsdel*.

Judge Smith in *Van Arsdel* found the record before him confirmed the insurer's vocational experts ignored the job responsibilities of the insured plant controller for a packaging company in determining disability under the policy's "own occupation" standard.[158] The insurer interpreted "own occupation" without considering the claimant's job description as a plant controller and instead mischaracterized the claimant's occupation as a controller. The insurer's vocational consultant described two different types of plant controllers; one with a sedentary physical demand level and the other requiring more direct floor work involving inventory demanding a light physical demand. The insurer and its vocational consultant chose the sedentary version of the controller position rather than light duty version without explaining why it did so. Judge Smith found the insurer should have considered the claimant's duties, including the actual job description provided by the employer, when characterizing the claimant's actual occupation as it is performed in the national economy.[159]

But we are not reviewing the same fact pattern reviewed by Judge Smith in *Van Arsdel*. The administrative record shows Unum's Vocational Consultant Degenhardt considered the Pilots' Association's job description, the eDOT classification of ship pilot, Mr. Hans's description, and Rehabilitation Counselors Galarraga's and Duchette's opinions.[160] Unum through Vocational Consultant Degenhardt explained climbing and balancing, which would include embarking and disembarking a vessel by gangway or ladder, are considered in the ship pilot classification by eDOT and DOT.

Unlike the facts before Judge Smith, we do not have a decision by Unum selecting one job classification over another. We have Mr. Hans's asking Unum to consider a composite of two occupations as constituting his "regular occupation." Unlike *Van Arsdel*, Unum did not mischaracterize Mr. Hans's regular occupation, nor did Unum ignore the requirements of Mr. Hans's type of occupation. We cannot find on the administrative record Unum's evaluation and conclusion Mr. Hans's regular occupation as performed in the national economy is a ship pilot requiring light duty rather than a composite ship pilot and deckhand is arbitrary and capricious.

### 2. Unum's denial based on its medical review is not arbitrary and capricious.

Mr. Hans argues Unum's benefits decision is arbitrary and capricious because it improperly dismissed the opinions of his treating providers and improperly dismissed Mr. Hans's functional capacity evaluation, insisted on objective evidence of long COVID even though there is no objective testing for long COVID, and improperly focused on statements by Mr. Hans's treating providers of improvement while ignoring the treating providers' opinions as to disability.

The Group Policy required Mr. Hans to show disability when Unum determines he is "limited from performing the material and substantial duties of [his] regular occupation due to [his] sickness or injury" and to show he is "continuously disabled through [the] elimination period": May 17, 2023 (the date Mr. Hans reported he became unable to work plus 360 days) to May 10, 2024.[161] Unum determined Mr. Hans did not show disability through the elimination period and denied long term disability benefits.

Mr. Hans faults Unum for assigning greater weight to the opinions of its non-examining, in-house physicians rather than the opinions of his treating providers. Mr. Hans argues the treating providers who "actually observed" him—Dr. Ridilla, Nurse Scott, and Dr. Ingberman—all concluded he remained unable to work, noting fatigue, difficulty getting out of bed, lack of mental

clarity, post-exertional malaise, and autonomic instability.[162] He argues Unum's medical reviewers Dr. Turner, Dr. McCarthy, and Dr. Greenstein improperly dismissed the opinions of his treating providers.

Mr. Hans concedes Unum is not required to "accord special deference" to his treating providers not is a "heightened burden of explanation" imposed on Unum when rejecting the opinions of treating providers under the Supreme Court's decision in *Black & Decker Disability Plan v. Nord*.[163] But, he argues, Unum may not "arbitrarily refuse to credit" his "reliable evidence, including the opinions of a treating physician" required by the Supreme Court's holding in *Black & Decker*.[164]

Consistent with *Black & Decker*, Unum is permitted to consider and rely on the opinions of its non-examining medical reviewers but cannot disregard the opinions of Dr. Ridilla, Nurse Scott, and Dr. Ingberman without a reasoned explanation. The record shows Unum did not ignore or arbitrarily refuse to credit the conclusions of Mr. Hans's treating providers. The record instead shows Unum provided a reasoned explanation for discounting the opinions of Mr. Hans's treating providers.

Unum's Medical Consultant Dr. Turner and Unum Designated Medical Officer Dr. McCarthy, both internists, each reviewed the medical records in June, July, and August 2024. In her third record review in August 2024, Dr. Turner concluded the medical and behavioral health records did not support restrictions and limitations precluding Mr. Hans from his occupation. She explained why she disagreed with Dr. Ridilla, including Mr. Hans's report of an almost ninety percent return to baseline after treatment, including cognition, about a seventy to eighty percent return of pre-COVID functioning, normal cardiology evaluation and testing, and lab testing inconsistent with an autoimmune disorder, recognized an Epstein–Barr virus consistent with an

earlier infection the timing of which could not be determined, explained Mr. Hans's report of rapid heart rate with exertion is inconsistent with his treating cardiologist's recommendation to wean off metoprolol (a beta blocker used for slow heart rate and blood pressure), and explained Mr. Hans declined his primary care physician's recommendation of low-dose Neurontin (used to treat nerve pain) for tingling sensations, and the intensity of management did not support significant impairment.[165]

Dr. McCarthy's third record review in August 2024 explained why she disagreed with Dr. Ridilla's opinion of disability. Dr. McCarthy noted "extremely minimal" exam findings, noted treatment frequency of less than monthly and consisting of minor medication prescriptions is consistent with low treatment frequency and intensity, noted unremarkable cardiology evaluations, and noted Mr. Hans's reports of improvement.[166] She concluded the medical records did not support a finding of restrictions and limitations, even giving significant weight to Dr. Ridilla's office notes.[167]

On appeal from the denial of benefits, Unum referred Mr. Hans's file to internist Dr. Greenstein, including a January 2025 functional capacity evaluation by Occupational Therapist Eckert. Dr. Greenstein reviewed the medical records and concluded restrictions and limitations reported by treating providers Dr. Ridilla, Nurse Scott, and Dr. Ingberman are not supported by the record. Dr. Greenstein explained the reasoning for his conclusion; Mr. Hans's reported symptoms are "disproportionate to the clinically unremarkable exams and diagnostics," cardiology and neurology exams and diagnostics are normal, Mr. Hans reported improvement, the absence of an Epworth sleepiness scale, the absence of other diagnostic tests, and no description of orthostatic vitals, painful or decreased joint and spine motions, weakness, or other organ, neurologic, or mental status deficiencies or abnormalities.[168]

Unum's medical reviewers explained why they disagreed with the treating providers based on the medical record. We cannot find its decision arbitrary and capricious.

Mr. Hans also argues Unum's medical reviewers not only ignored the opinions of his treating providers but also insisted on objective evidence of "abnormality" from long COVID where no objective, diagnostic tests exist for the condition. Mr. Hans argues the objective test he provided to Unum—Occupational Therapist Eckert's January 2025 two-day functional capacity evaluation—shows he is disabled and is reinforced by his treating providers and Rehabilitation Counselors.

Mr. Hans cites Dr. Ingberman's report there is no diagnostic test for long COVID syndrome. Mr. Hans argues long COVID, like chronic fatigue syndrome and fibromyalgia, has no objective test to establish the diagnosis.

Unum responds there is a distinction between requiring objective evidence of a diagnosis of long COVID and requiring objective evidence of the functional limitations resulting from the condition. Unum may not insist on objective evidence of long COVID and a decision to deny benefits based on the lack of objective evidence of the diagnosis is arbitrary and capricious.[169] But it is not an abuse of discretion to require objective evidence a condition, like chronic fatigue syndrome and fibromyalgia, is "sufficiently disabling to warrant an award" of long term disability benefits.[170]

Unum looked for objective evidence of Mr. Hans's *functional* limitations resulting from long COVID. Unum's medical reviewers noted cardiology examinations and testing did not support cardiac-related symptoms causing Mr. Hans to seek emergency treatment in April 2023. Mr. Hans's cardiologists did not note restrictions or limitations. None of Mr. Hans's treating physicians documented orthostasis leading to complaints of dizziness and balance issues as

causing limitations. His treating neurologist Dr. Bromley noted a normal physical and mental examination and normal brain study.

Mr. Hans and his treating providers reported fatigue. Occupational Therapist Eckert evaluated Mr. Hans in a two-day functional capacity evaluation in January 2025. Occupational Therapist Eckert reported Mr. Hans engaged in all activities meant to replicate his job functions including jumping, climbing, standing on unsteady surfaces, and walking in different conditions and, while reporting mild to moderate pain, dizziness and visual disturbances, these symptoms did not impact his ability to complete the tasks on the first day of evaluation.[171] On the second day of testing, Mr. Hans reported increased pain, decreased global strength in all joints, decreased grip strength, decline in balance, increased heart rate which did not return to baseline heart rate levels on day one of the test, trembling and shaking not reported on day one of testing, and digestive symptoms.[172] Occupational Therapist Eckert concluded symptoms displayed on the second day of testing is likely due to decreased endurance and strength caused by dysautonomia which may be the result of long COVID or a side effect of an active Epstein-Barr virus.[173] Occupational Therapist Eckert opined "it would be dangerous for [Mr. Hans] to return to [his] previous level of work, considering the extreme level of physicality the job entails, in addition to the long hours and less than ideal weather conditions he is required to perform under."[174]

Unum determined Occupational Therapist Eckert's functional capacity evaluation in January 2025 insufficient to show functional incapacity during the elimination period. Dr. Greenstein addressed Occupational Therapist Eckert's functional capacity evaluation.[175] Reviewing the functional capacity evaluation, Dr. Greenstein noted while Mr. Hans reported mild to moderate pain, dizziness, and visual disturbances on the first day of testing, the symptoms did not impact his ability to complete "many" functional activities and tasks.[176] Dr. Greenstein noted

Mr. Hans requested more breaks on the second day of testing and his baseline heart rate went higher and he had reported symptoms not reported on the first day, but the examination revealed normal heart rate of 84 (pre-test) and 89 (post-test), and spine, hip, shoulder motion, spine core/extremity/joint strength measured at 4+/5 to normal on the first day and 4 to normal on the second day.[177] Dr. Greenstein then summarized his disagreement with Occupational Therapist Eckert's January 2025 functional capacity evaluation, questioning the "clinical relevance" of the evaluation eight months after the end of the elimination period and opining the evaluation is "a better measure" of the minimum level of activity Mr. Hans can do, not the maximum, because the test can be stopped for any reason.[178] Dr. Greenstein opined Mr. Hans's reported symptoms are not consistent with physical exams, diagnostic findings, treatment intensity, or reporting activities and do not support Mr. Hans's inability to perform his occupational demands.[179]

Mr. Hans takes issue with Dr. Greenstein's reliance on the timing of the functional capacity evaluation as being outside the elimination period. Mr. Hans argues "courts routinely hold" functional capacity evaluations performed months after the onset of disability are probative of the claimant's condition where the condition is chronic and there is no evidence of an intervening change in condition. Mr. Hans argues Unum's cite to *Ovist v. Unum Life Insurance Company of America*, a 2021 decision from the United States Court of Appeals for the First Circuit, is inapplicable here and in "direct tension" with *Holmstrom v. Metropolitan Life Insurance Company*, a 2010 decision from the United States Court of Appeals for the Seventh Circuit.[180] We studied both cases.

In *Ovist*, a claimant with fibromyalgia and chronic fatigue syndrome began receiving long term disability benefits later terminated by Unum under a provision of the applicable plan limiting the maximum benefit period for disabilities based primarily on self-reported symptoms. The

claimant challenged Unum's decision to terminate her benefits, focusing on Unum's requirement she obtain objective evidence of her functional limitations to avoid the self-reported symptoms limitation in the plan.

The claimant provided Unum with the results of a cardiopulmonary exercise test to determine her functional capacity and assess the recovery response to a standardized physical stressor.[181] The cardiopulmonary exercise test taken over two days showed the claimant's results varied over the two days, her responses indicated a higher probability of "running out of energy" on the second day, symptoms were heightened during the second day of testing, and cognitive testing appeared abnormal. Unum's medical consultant concluded the cardiopulmonary exercise test purportedly showing limitations in the claimant's functional capacity were based on her reported symptoms and inconsistent with the minimal and non-specific findings.[182] Unum's medical consultant also expressed a concern about the relevance of the test performed after Unum closed the claim.

The claimant sued Unum arguing its medical consultant improperly rejected the cardiopulmonary exercise test including the timing of the test. The Court of Appeals for the First Circuit disagreed. The court of appeals first distinguished "between requiring objective evidence of conditions that do not lend themselves to objective verification and requiring objective evidence of the functional limitations resulting from a claimant's conditions."[183] The court reasoned the plan language defined disability and eligibility for long term disability benefits if a claimant is "unable to complete the 'material and substantial duties' of their jobs due to their illnesses."[184] The court concluded there is nothing in the record to show Unum's medical opinion is unreliable, and the medical opinion provided a reasonable basis for Unum to find the cardiopulmonary exercise test alone "did not compensate for the considerable absence in the record of objective

evidence" of the claimant's functional loss.[185] And the court concluded even though the cardiopulmonary exercise test provided "some objective proof" of functional loss, the opinion of Unum's medical consultant the claimant's functional limitation is based primarily on self-reported pain and fatigue is reasonable.[186]

Mr. Hans argues the court of appeals's *Ovist* analysis does not apply because it "did not involve a [functional capacity evaluation]."[187] We disagree. The cardiopulmonary exercise test in *Ovist* specifically tested for the claimant's functional capacity; we see no distinction between a cardiopulmonary exercise test evaluating functional capacity and a functional capacity evaluation. Nor do we find the argument *Ovist* is "in direct tension" with the *Holmstrom* decision persuasive. In *Holmstrom*, the claimant submitted two functional capacity evaluations performed seven years apart. The insurer found the older evaluation sufficient but found the evaluation seven years later insufficient to show disability without explaining why it did so.[188] The court found "no material differences" between either evaluation and the insurer never communicated to the claimant it required an evaluation based on the same form and level of detail as in the older evaluation, concluding the insurer "failed to explain its rejection" of the later examination and "an absence of reasoning in the record" to support the insurer's conclusion.[189]

We do not find *Holmstrom* in "direct tension" with *Ovist*. Both require an insurer to explain its rationale when rejecting functional capacity evidence. Both cases turn on whether the insurer explained its reasoning for rejecting a functional capacity evaluation. If Dr. Greenstein relied solely on the timing of January 2025 functional capacity evaluation, we may have a question of the reasonableness of Unum's benefit decision. It is true Dr. Greenstein explained the Occupational Therapist Eckert's functional capacity evaluation performed eight months after the elimination period raised clinical relevance—but he did not end there. He explained the evaluation is a better

measure of the minimal activity Mr. Hans can perform, not the maximum, because the test can be stopped for any reason. Dr. Greenstein also reasoned Mr. Hans's reported symptoms and limitations are not supported by and are inconsistent with the examinations, diagnostics, and therapies of his treating providers. The timing is not the only basis for Dr. Greenstein's disagreement with Occupational Therapist Eckert's functional capacity evaluation.

### 3. The alleged structural conflict of interest does not render Unum's denial arbitrary and capricious.

Mr. Hans also points to Unum's structural conflict as a factor weighing in favor of finding its benefits decision arbitrary and capricious. A structural conflict of interest may demonstrate an arbitrary and capricious denial of benefits. We are directed by our Court of Appeals to consider a structural conflict as a factor in our review of Unum's benefit decision under the arbitrary and capricious standard.[190]

Mr. Hans argues Unum's structural conflict of interest, both as the evaluator of a benefits claim and the payor of benefits, requires we find Unum's denial of benefits arbitrary and capricious. Mr. Hans presented evidence in the record showing Unum's "historically entrenched" conflict of interest by citing a 2004 report from insurance regulators across the country finding Unum engaged in systemic unfair claim practices requiring Unum to reassess over 200,000 claims and pay a $15 million fine and a 2007 law review article highlighting Unum's history of denying meritorious claims.

We recognize Unum's problematic history. But we do not assume its conduct in the past made its decision as to Mr. Hans arbitrary and capricious. We must determine the weight we assign to Unum's conflict considering the record as a whole.[191] Mr. Hans offers Unum's history of conflict of interest and claims administration. Unum submitted the Declaration of Lead Appeals

Specialist Lynn McGuiness in Unum's Portland, Maine appeals unit.[192] In doing so, we may consider "extra-record evidence that would affect the weight afforded to a structural conflict of interest."[193]

Lead Appeals Specialist McGuiness swears she completed a "full and fair review" of Mr. Hans's claim and "considered all additional materials" he submitted before she determined the additional information submitted by Mr. Hans did not change the initial benefits denial made by Benefit Specialist Guiggey and "signed off" on by Quality Complaint Consultant Lauren LaPointe.[194] Lead Appeals Specialist McGuiness swears she and Benefit Specialist Guiggey work in units independent of each other with separate management structures and personnel, including separate medical and vocational resources.[195] She swears she made the appeal decision consistent with her responsibility as an appeals specialist to complete an independent and full and fair review of the adverse benefit decision appealed by Mr. Hans.[196] She swears she did not discuss the initial denial decision with Benefit Specialist Guiggey or anyone in the Benefits Center or discuss the claim "with anyone in the Benefit Specialist side or anyone in the Benefits Center" concerning Mr. Hans's claim, reaching her own conclusions independently.[197]

Lead Appeals Specialist McGuiness swears she had access to, and reviewed, Mr. Hans's entire claims file, she reviews all claims "without regard to the entity responsible for paying the claim," she "ha[s] never been discouraged from finding that a claim is payable or encouraged to find that a claim is not payable," and swears her compensation with Unum is not dependent on the number of claim denials upheld or overturned and there are no claim quotas, goals, or targets.[198]

Lead Appeals Specialist McGuiness swears if she requires consultation with medical specialists during her appellate review process, she refers to a medical professional who has no involvement in the initial claim investigation and additional vocations reviews are typically

34

referred to professionals who did not work on the claim.[199] She swears medical and vocational specialists consulted by Unum do not decide whether a claimant is disabled within the terms of the Group Policy, they did not do so here, and she and Benefit Specialist Guiggey each at different points in the process made the benefits decision.[200] Lead Appeals Specialist McGuiness swears she has no role or responsibility in management, reporting, or other functions regarding the profit and loss of Unum Group or Unum Life Insurance Company of America other than publicly available information and she has no familiarity with or information about or has access to claims reserve processes.[201] She swears she has no way of knowing how her claim decision affects the profit or losses of Unum Group or Unum Life Insurance Company of America and does not take into account the financial implications of her appeal decisions.[202]

Considering Mr. Hans's submissions of Unum's past unfair claim practices and Lead Appeals Specialist McGuiness's sworn Declaration, we conclude Unum's structural conflict is a neutral factor among the factors we must weigh when considering a structural conflict. The structural conflict does not weigh in favor of finding Unum's benefits decision is arbitrary and capricious. For example, Judge Baylson found a structural conflict of interest in the administration and payment of claims, but when he weighed the conflict with "scant" procedural irregularities in the record, he concluded the structural conflict "negligible" and "does not heavily favor" either party.[203] We similarly find the structural conflict factor negligible where we find no procedural irregularities and conclude a structural conflict does not weigh in favor of a finding Unum's adverse benefits decision is arbitrary and capricious.

We cannot find Unum's decision to deny benefits arbitrary and capricious; it did not arbitrarily refuse to credit the opinions of his treating providers and it properly required objective evidence of functionality. Unum explained its reasoning for its decision. We cannot disturb

Unum's decision if it is reasonable and supported by relevant evidence as a reasonable mind might accept as adequate to support a conclusion.[204]

### III.  Conclusion

We are constrained by the standard of review applied to the administrative record. The Supreme Court does not allow us to disregarded reasoned benefits decisions absent certain findings based on our careful review of the administrative record. We may not substitute our own judgment in determining benefits. We may not disturb a reasonable benefits decision supported by record evidence a reasonable mind might accept as adequate to support Unum's conclusion. We grant Unum's motion for judgment and deny Mr. Hans's motion for judgment.

---

[1] ECF 33, Hans SUMF ¶ 2. Our Policies require parties moving for relief under Fed. R. Civ. P. 56 include a memorandum, separate Statement of Undisputed Material Facts and an appendix in support of summary judgment. The parties cross-moved for summary judgment on the administrative record submitted as ECF 34 ("AR"). Mr. Hans filed a Motion for summary judgment, Memorandum in support of summary judgment, and Statement of Undisputed Material Facts ("Hans SUMF"). ECF 32, 32–1, 33. Unum opposed Mr. Hans's motion, responded to Mr. Hans's SUMF, and asserted Additional Facts. ECF 38, 39. Unum filed its Motion for summary judgment, Memorandum in support of summary judgment, and Statement of Undisputed Material Facts ("Unum SUMF"). ECF 35, 35–1, 35–2. Mr. Hans opposed Unum's motion and responded to Unum's SUMF. ECF 36, 37.

[2] ECF 34–2, AR 104. River pilots are on call twenty-four hours a day, seven days a week and are required to board vessels, including by gangways and climbing "Jacob's Ladders [sic]" and are "often transferred from a moving launch boat to a moving vessel in all conditions" and "must be in top physical shape" to perform their duties. *Id.*; ECF 33, Hans SUMF ¶ 12. The Department of Labor requires a Jacob's ladder to be a "double rung or flat tread type" ladder "properly secured" on the side of a vessel. 29 C.F.R. § 1918.23.

[3] ECF 33, Hans SUMF ¶ 4.

---

[4] ECF 34-2, AR 159.

[5] *Id.*, AR 165.

[6] *Id.*, AR 138 (emphasis added).

[7] *Id.*

[8] *Id.*, AR 157.

[9] *Id.*, AR 155–56.

[10] *Id.*, AR 138.

[11] *Id.*

[12] *Id.*, AR 130.

[13] ECF 33, Hans SUMF ¶ 15.

[14] *Id.*

[15] ECF 35–2, Unum SUMF ¶ 7.

[16] ECF 33, Hans SUMF ¶¶ 16–19.

[17] *Id.*, Hans SUMF ¶ 19. The axilla (or axillary) is the armpit or underarm.
*See* https://my.clevelandclinic.org/health/body/axilla-armpit [https://perma.cc/MH5L-8ZWZ].

[18] ECF 33, Hans SUMF ¶¶ 17–19.

[19] *Id.*, Hans SUMF ¶¶ 20–21.

[20] *Id.*, Hans SUMF ¶ 20. Tachycardia is the medical term for a heart rate over 100 beats per minute.
*See* https://www.mayoclinic.org/diseases-conditions/tachycardia/symptoms-causes/syc-20355127 [https://perma.cc/G5LT-YG77].

Paresthesia is the medical term for a tingling, burning, pricking or prickling, skin-crawling, itching, "pins and needles," or numbness on or just underneath the skin.
*See* https://my.clevelandclinic.org/health/symptoms/24932-paresthesia [https://perma.cc/MQ2C-BENB].

Dyspnea is the medical term for shortness of breath.
*See* https://my.clevelandclinic.org/health/symptoms/16942-dyspnea [https://perma.cc/FP7C-3TX6].

---

[21] ECF 33, Hans SUMF ¶ 20.

[22] *Id.*, Hans SUMF ¶ 21; ECF 34–3, AR 1952. "Dysautonomia" is the general medical term for disorders disrupting the autonomic nervous system like blood pressure and heart rate. *See* https://my.clevelandclinic.org/health/diseases/6004-dysautonomia [https://perma.cc/7SAW-TVE8].

[23] ECF 33, Hans SUMF ¶ 18.

[24] *Id.*

[25] *Id.*, Hans SUMF ¶ 22.

[26] *Id.*

[27] *Id.*

[28] *Id.*, Hans SUMF ¶ 23.

[29] *Id.* Nurse Scott diagnosed "post-acute sequelae of SARS-CoV-2 infection" also known as long COVID or post-COVID-19 syndrome or long-haul COVID. *See* https://www.mayoclinic.org/diseases-conditions/coronavirus/in-depth/coronavirus-long-term-effects/art-20490351 [https://perma.cc/MZ2C-VSGQ].

[30] ECF 33, Hans SUMF ¶¶ 24–25.

[31] *Id.*, Hans SUMF ¶ 25.

[32] *Id.*, Hans SUMF ¶ 27.

[33] *Id.* The Epstein–Barr virus is a common viral infection. Once infected with the virus, the infection remains in the body in a dormant, inactivated or "sleeping" state. The virus can be reactivated and cause symptoms. *See* https://my.clevelandclinic.org/health/diseases/23469-epstein-barr-virus. [https://perma.cc/Q29P-PDGE].

[34] ECF 33, Hans SUMF ¶ 28.

[35] *Id.* Idiopathic is a medical term describing a condition with an unknown cause. *See* https://my.clevelandclinic.org/health/articles/idiopathic [https://perma.cc/3B72-ABTQ].

Peripheral neuropathy is an umbrella term for nerve diseases affecting a specific subdivision of the nervous system. *See* https://my.clevelandclinic.org/health/diseases/14737-peripheral-neuropathy [https://perma.cc/QST8-KAJN].

[36] ECF 33, Hans SUMF ¶ 28.

[37] *Id.*, Hans SUMF ¶ 29.

[38] *Id.*

[39] *Id.*

[40] *Id.*, Hans SUMF ¶ 30.

[41] *Id.*

[42] *Id.*, Hans SUMF ¶¶ 31–32.

[43] *Id.*, Hans SUMF ¶ 31.

[44] *Id.*

[45] *Id.*, Hans SUMF ¶ 32.

[46] *Id.*, Hans SUMF ¶¶ 31–32.

[47] *Id.*, Hans SUMF ¶ 33.

[48] *Id.*, Hans SUMF ¶ 34; ECF 34–2, AR 97–101.

[49] ECF 34-2, AR 97.

[50] *Id.*, AR 98.

[51] ECF 33, Hans SUMF ¶ 35; ECF 34–2, AR 103–09.

[52] ECF 34–2, AR 103.

[53] ECF 33, Hans SUMF ¶ 36; ECF 34–2, AR 110–112.

[54] ECF 34–2, AR 110. Mast cell activation syndrome is a condition causing intense episodes of swelling, shortness of breath, hives, diarrhea, vomiting, flushing, and itching without a clear trigger. Mast cells are a type of immune cell responsible for immune reactions. *See* https://my.clevelandclinic.org/health/diseases/mast-cell-activation-syndrome [https://perma.cc/9BVT-PL9B].

Postural orthostatic tachycardia syndrome (POTS) is a condition causing the heart to beat faster than normal when transitioning from a sitting or lying down position to standing up. *See* https://my.clevelandclinic.org/health/diseases/16560-postural-orthostatic-tachycardia-syndrome-pots [https://perma.cc/UYK3-QDT2].

[55] ECF 34–2, AR 111.

[56] *Id.*

[57] *Id.*

[58] ECF 33, Hans SUMF ¶ 37.

[59] *Id.*

[60] *Id.*, Hans SUMF ¶¶ 41–42.

[61] *Id.*, Hans SUMF ¶ 41. Vocational Consultant Fandel applied the ERI's Enhanced Dictionary of Occupational Titles ("eDOT") to determine Mr. Hans's occupation. *See* ECF 34–2, AR 576–77. ERI Economic Research Institute is a private company, not a government source, collecting wage and salary information for jobs in the United States (among other countries). ERI considers itself a "compensation and benefits research outsource." *See* https://cdn.erieri.com/help/GA/index.html?edot_background.htm [https://perma.cc/D86U-R8BH].

The United States Department of Labor compiled occupational information in the Dictionary of Occupational Titles ("DOT") in 1938. The Department of Labor abandoned the DOT in 1991 and replaced it with the "O*NET" system, a database of occupational characteristics and worker requirements information across the United States economy. https://www.dol.gov/agencies/eta/onet [https://perma.cc/93CT-DT5D].

The Administrative Record shows the parties used DOT, eDOT, and O*NET to define regular occupation. For example, Mr. Hans's vocational consultants referred to his occupation in the national economy as that of a "Pilot, Ship" and "Deckhand" using DOT codes. ECF 34–3, AR 1871–73. Unum's vocational consultants considered Mr. Hans's occupation in the national economy as a "Pilot, Ship" using the eDOT code. ECF 34–2, AR 576; ECF 34–4, AR 2859–64. Both the DOT and eDOT codes are identical and describe the occupation of "Pilot, Ship" identically. The Administrative Record also contains the O*NET code and occupational description for "Pilots, Ship." ECF 34–4, AR 2866. Neither party disputes the use of one database over the other.

[62] ECF 33, Hans SUMF ¶ 41; ECF 34–2, AR 576–77.

[63] ECF 34–2, AR 577.

[64] *Id.*, AR 587.

[65] *Id.*, AR 587–94.

[66] *Id.*, AR 593–94; ECF 39, Unum response to Hans SUMF ¶ 42.

[67] ECF 33, Hans SUMF ¶¶ 44, 46; ECF 34–2, AR 659–64, 689–91.

[68] ECF 34-2, AR 661–63.

[69] ECF 33, Hans SUMF ¶ 45; ECF 34–2, AR 683–84.

[70] ECF 34–2, AR 684.

[71] *Id.*

[72] *Id.*, AR 689–91.

[73] *Id.*

[74] *Id.*, AR 754–57.

[75] *Id.*, AR 757.

[76] *Id.*

[77] ECF 33, Hans SUMF ¶¶ 48–49; ECF 34–2, AR 776–80, 786–87.

[78] ECF 33, Hans SUMF ¶ 51.

[79] ECF 34–3, AR 1147–50.

[80] *Id.*, AR 1147, 1151.

[81] ECF 33, Hans SUMF ¶ 52; ECF 34–2, AR 811.

[82] ECF 33, Hans SUMF ¶¶ 53–54.

[83] ECF 34–2, AR 929–32.

[84] *Id.*, AR 963–65.

[85] ECF 33, Hans SUMF ¶ 55; ECF 34–2, AR 973–81.

[86] ECF 34–2, AR 973–81.

[87] ECF 33, Hans SUMF ¶ 56.

[88] *Id.*. Unum disputes the documents included in Mr. Hans's appeal contained "information and documentation regarding Unum's conflict of interest." ECF 39, Unum response to Hans SUMF ¶ 39.

[89] ECF 34–3, AR 1805–67; ECF 33, Hans SUMF ¶ 57. Unum disputes Therapist Eckert is qualified to opine on vocational issues. ECF 39, Unum response to Hans SUMF ¶ 57.

[90] ECF 34–3, AR 1807.

[91] *Id.*

[92] *Id.*

[93] *Id.*

[94] ECF 33, Hans SUMF ¶ 59; ECF 34–4, AR 2538–39.

[95] ECF 33, Hans SUMF ¶ 58; ECF 34–3, AR 1871–88. Unum disputes Rehabilitation Counselors Galarraga and Duchette are qualified to opine on the medical question of Mr. Hans's impairment. ECF 39, Unum response to Hans SUMF ¶ 58.

[96] ECF 34–3, AR 1871–73.

[97] *Id.*

[98] ECF 34-3, AR 1871–73.

[99] ECF 33, Hans SUMF ¶ 60; ECF 34–3, AR 1448–50.

[100] ECF 33, Hans SUMF ¶ 61.

[101] *Id.*, ECF 34–3, AR 1446.

[102] ECF 33, Hans SUMF ¶ 63.

[103] ECF 34–4, AR 2819–21.

[104] ECF 34–4, AR 2820.

42

[105] *Id.*

[106] ECF 33, Hans SUMF ¶ 64; ECF 34–4, AR 2825–29.

[107] ECF 34–4, AR 2828–29.

[108] *Id.*

[109] ECF 33, Hans SUMF ¶ 65.

[110] *Id.*, Hans SUMF ¶¶ 66–68.

[111] ECF 34–4, AR 2948.

[112] *Id.*, AR 2948–49.

[113] *Id.*, AR 2899–90.

[114] ECF 33, Hans SUMF ¶¶ 69–70.

[115] ECF 34–4, AR 3007–10.

[116] *Id.*, AR 3009–10.

[117] *Id.*, AR 3010.

[118] ECF 33, Hans SUMF ¶ 70; ECF 34–4, AR 3014–15.

[119] ECF 33, Hans SUMF ¶ 72; ECF 34–4, AR 3149–61.

[120] ECF 1.

[121] ECF 20.

[122] 29 U.S.C. § 1132(a)(1)(B) (also known as ERISA section 502(a)(1)(B) codified at 29 U.S.C. § 1132(a)(1)(B)). For ease of reference, we refer to this provision of ERISA as section 502(a)(1)(B).

[123] *Id.*

[124] ECF 37, Hans response to Unum SUMF ¶ 6; ECF 34–2, AR 165.

[125] *Mullins v. Consol Energy, Inc. Long Term Disability Plan*, 110 F.4th 180, 185 (3d Cir. 2024) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)).

[126] ECF 34–2, AR 165.

[127] *Noga v. Fulton Fin. Corp. Emp. Benefit Plan*, 19 F.4th 264, 271–72 (3d Cir. 2021) (citing *Howley v. Mellon Fin. Corp.*, 625 F.3d 788, 793 (3d Cir. 2010)).

[128] *Id.* at 272 ("The administrative record consists of the materials before the fiduciary who makes the benefit decisions on internal review, and it typically contains relevant plan documents (such as an insurance policy), the claim file (the claim, supporting information supplied by the claimant, as well as information related to the claim that was considered, collected, or generated by the fiduciary), and the fiduciary's final determination with respect to the claim.") (citing *Howley*, 625 F.3d at 793).

[129] *Mullins*, 110 F.4th at 187 (quoting *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 831, 834 (2003)).

[130] *Id.* at 185 (quoting *Miller v. Am. Airlines, Inc.*, 632 F.3d 837, 845 n. 2 (3d Cir. 2011)).

[131] *Id.* at 185–86 (internal citations omitted).

[132] *Id.* at 186 (quoting *Fleisher v. Standard Ins. Co.*, 679 F.3d 116, 121 (3d Cir. 2012)).

[133] *Id.*

[134] *Noga*, 19 F.4th at 276 (citations omitted).

[135] *Id.* at 276.

[136] *Id.* (citations omitted).

[137] *Id.*

[138] *Id.* (citing *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 117 (2008)).

[139] ECF 34–2, AR 157.

[140] *Id.*, AR 576; ECF 34–4, AR 2859–64.

[141] ECR 34–4, AR 3010. Vocational Consultant Degenhardt initially performed a vocational review on March 17, 2025. *Id.*, AR 2819–21. She reviewed additional materials submitted by Mr. Hans, including his statement, an addendum from Rehabilitation Counselors Galarraga and Duchette, and vocational handbook materials on April 30, 2025. *Id.*, AR 3007–11.

[142] *Id.*, AR 2819–21; 3007–10.

[143] *Id.*, AR 2820.

[144] *Id.*

44

[145] *Id.*, AR 3009.

[146] *Id.*, AR 3009–10.

[147] *Id.*

[148] 344 F.3d 381 (3d Cir. 2003).

[149] *Id.* at 385.

[150] *Id.* at 385–86.

[151] *Id.* at 392.

[152] ECF 32–1 at 10 (citing *Lasser*, 344 F.3d at 386).

[153] Mr. Hans also cites *Miller v. American Airlines, Inc.* for the proposition Unum's vocational review is arbitrary and capricious because our Court of Appeals requires "any rational decision to terminate disability benefits under an own-occupation plan consider whether the claimant can actually perform the specific job requirements of a position." 632 F.3d 837, 855 (3d Cir. 2011). In *Miller*, the employer airline's disability plan provided "own occupation" disability benefits where a pilot deemed disabled from piloting a plane may receive disability benefits even if he/she could work in a different capacity. Pilot Miller's treating physician diagnosed him with anxiety and psychosis making him unable to pilot a plane. The airline referred Pilot Miller's claim to outside medical reviewers who concluded Pilot Miller is not disabled. Our Court of Appeals determined the airline's termination of long term disability benefits is arbitrary and capricious because neither medical reviewer considered whether Pilot Miller could actually perform his duties as a pilot with his diagnoses and did not explain how he could perform his duties as a pilot with anxiety and a latent risk of psychosis triggered by stress. *Id.* at 855. The airline's "failure to address the specific demands" of a pilot made its decision to terminate benefits unreasoned and arbitrary and capricious. *Id.* Our Court of Appeals's *Miller* analysis is distinguishable because the definition of "regular occupation" is not the same as the Unum policy here and the record reflects Unum addressed the demands of a ship pilot.

[154] *McCann v. Unum Provident*, 907 F.3d 130, 148 (3d Cir. 2018).

[155] *Id.* at 147.

[156] *Id.* at 148.

[157] 267 F. Supp. 3d 538 (E.D. Pa. 2017).

[158] The Liberty Life policy in *Van Arsdel* defined "own occupation" as "the Covered Person's occupation that he was performing when his Disability or Partial Disability began. For purposes of determining Disability under this policy, Liberty [Life] will consider the Covered Person's occupation as it is normally performed in the national economy." *Id.* at 572.

[159] *Id.* at 578.

[160] ECF 34–4, AR 2819–21, 3007–11.

[161] ECF 34–2, AR 138.

[162] Mr. Hans does not argue Unum ignored the clinical judgments of his treating cardiologists (Dr. George, Dr. Gabler, and Dr. Diamanti) or his treating neurologist (Dr. Bromley).

[163] 538 U.S. 822, 830–31 (2003).

[164] *Id.* at 834. Mr. Hans characterizes a claims administrator's reliance on "outlier opinions of non-examining physicians to deny disability benefits where the evidence overwhelmingly favors disability" is a "procedural irregularity." ECF 32–1 at 9. In *Black & Decker*, the Supreme Court rejected "judicial imposition of a treating physician rule, whether labeled 'procedural' or 'substantive'" in ERISA denial of benefits claims. *Id.* at n. 4.

[165] ECF 37, Hans response to Unum SUMF ¶ 31; ECF 34–2, AR 931–32.

[166] ECF 37, Hans response to Unum SUMF ¶ 32; ECF 34–2, AR 963–64.

[167] *Id.*

[168] ECF 37, Hans response to Unum SUMF ¶ 43; ECF 34–4, AR 2825–29. An Epworth sleepiness scale is a self-assessment questionnaire to identify daytime sleepiness and used to assess whether daytime sleepiness interferes with the ability to do routine tasks. *See* https://my.clevelandclinic.org/health/diagnostics/epworth-sleepiness-scale-ess [https://perma.cc/QKY4-XQDN].

[169] *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 443 (3d Cir. 1997) (plan administrator's denial of long term disability benefits to claimant with chronic fatigue syndrome where there is no test for such condition is arbitrary and capricious).

[170] *Balas v. PNC Fin. Servs. Grp., Inc.*, No. 10-249, 2012 WL 681711, at *10 (W.D. Pa. Feb. 29, 2012) (collecting cases); *see also Ackaway v. Aetna Life Ins. Co.*, No. 14-1300, 2016 WL 5661724, at * 28 (E.D. Pa. Sept. 30, 2016) (insurer's denial of long term disability benefits based on a determination claimant failed to provide sufficient medical documentation of inability to perform material duties of claimant's own occupation as required by the terms of the plan is not an abuse of discretion).

[171] ECF 34-3, AR 1806–07.

[172] *Id.*, AR 1807.

[173] *Id.*

[174] *Id.*

[175] ECF 34–4, AR 2825–29.

[176] *Id.*, AR 2827.

[177] *Id.*

[178] *Id.,* AR 2828.

[179] *Id.*, AR 2828–29.

[180] *Ovist v. Unum Life Ins. Co. of Am.*, 14 F.4th 106 (1st Cir. 2021); *Holmstrom v. Metropolitan Life. Ins. Co.*, 615 F.3d 758 (7th Cir. 2010).

[181] *Ovist*, 14 F.4th at 114.

[182] *Id.* at 115.

[183] *Id.* at 118.

[184] *Id.* at 120.

[185] *Id.* at 122.

[186] *Id.*

[187] ECF 36 at 9.

[188] *Holmstrom*, 615 F.3d at 770–71.

[189] *Id.* at 771–72.

[190] *Noga*, 19 F.4th at 275–76 (citing *Glenn*, 554 U.S. at 111).

[191] *Glenn*, 554 U.S. at 115–18.

[192] ECF 39.

[193] *Noga*, 19 F.4th at 276.

[194] ECF 39, Declaration ¶ 3.

[195] *Id.* ¶ 5.

[196] *Id.* ¶ 6.

[197] *Id.* ¶ 7.

[198] *Id.* ¶¶ 10–13.

[199] *Id.* ¶ 14.

[200] *Id.* ¶¶ 15–16.

[201] *Id.* ¶ 17.

[202] *Id.* ¶¶ 18–21.

[203] *Cockerill v. Corteva, Inc.*, No. 21-3966, 2024 WL 5159892 (E.D. Pa. Dec. 18, 2024).

[204] *Mullins*, 110 F.4th at 186.